UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

RICH MEDIA CLUB LLC,

              Plaintiff,

       vs.

GANNETT CO., INC.

              Defendant.

Case No. 2:25-cv-934

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, against Defendant Gannett Co., Inc. that relates to five U.S. patents owned by Rich Media Club, LLC ("RMC"): 9,824,074 ("the '074 Patent") 11,004,090 ("the '090 Patent"); 11,468,453 ("the '453 Patent"); 11,741,482 ("the '482 Patent"); and 12,125,051("the '051 Patent") (collectively, the "Patents-in-Suit").

### The Parties

1.     Plaintiff Rich Media Club LLC ("RMC") is a company organized under the laws of the State of Florida with a principal place of business in Salt Lake City, Utah.

2.     Defendant Gannett Co., Inc. ("Gannett") is a corporation duly organized and existing under the laws of New York. Gannett may be served through its registered agent Corporation Service Company at 80 State Street, Albany, NY 12207.

3.     The Defendant is a large publisher of newspapers and on-line content, including the national publication USA TODAY and its companion website, usatoday.com.

### Jurisdiction and Venue

4.     This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, et seq., and more particularly 35 U.S.C. § 271.

5.      This Court has jurisdiction over the subject matter of the patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Gannett pursuant to due process and/or the Texas Long Arm Statute because, inter alia, (i) Gannett has done and continues to do business in Texas, including by owning and operating at least six newspapers and a digital marketing solutions company, LocaliQ, in Texas; and (ii) Gannett has committed and continues to commit acts of patent infringement in the State of Texas, including by operating websites accessible in Texas that use technologies that infringe the Patents-in-Suit; and (iii)  on information and belief, one or more Gannett subsidiaries or affiliates is registered to do business in Texas.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1400(b). Venue is further proper because Gannett has committed and continues to commit acts of patent infringement in this district, and Gannett has regular and established places of business in this district, including at least at 6111 W Plano Pkwy, Plano, TX (the office of LocaliQ).

## Background Facts

### The Patents-in-Suit

8.      U.S. Patent No. 9,824,074, entitled "Content Rendering and Control System for a Pre-Defined Area of a Content Page," was duly issued on November 21, 2017 and is assigned to Plaintiff.

9.      U.S. Patent No. 11,004,090 entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on May 11, 2021 and is assigned to Plaintiff.

10.      U.S. Patent No. 11,468,453, entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on October

11, 2022 and is assigned to Plaintiff.

11.    U.S. Patent No. 11,741,482, entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on August 29, 2023 and is assigned to Plaintiff.

12.    U.S. Patent No. 12,125,051, entitled "System and Method for Creation, Distribution and Tracking of Advertising via Electronic Networks," was duly issued on October 22, 2024 and is assigned to Plaintiff.

**Online Advertising and RMC's Technology**

13.    Online advertising, including placing ads on web pages, is one of the largest advertising markets in the world.  It is also one of the most technologically complex because of the various ways that ads can be placed on web pages, monitored, and replaced.  The technologies used for internet advertisements are different than those used in non-internet based mediums such as print and broadcast advertising.

14.    The online advertising system also faces many challenges that are not common in certain other media.  For example, ads placed in printed media are readily verifiable to advertisers.  The ads either appear in print or were not printed for some reason.  Broadcast television ads are similar.  They can be verified as having run, in full, during the purchased ad time by reviewing recordings of broadcasts.  There is no situation where the printed or televised ads were not "viewable" when a reader turned to a page of a publication or watched an ad-supported broadcast.

15.    Online advertising is different.  For any given content, such as an online magazine article, the way the user reads the article varies significantly for different users.  Screen sizes can vary from small smartphone screens to large multi-screen monitors. The size of the browser widow on each of these various sized screens is itself varied.  An ad placed that would have run on page

2 of a print article may fall on many different "pages" of an article that is scrolled through on many different users' differently-sized web browsers and screens.

16.     The internet advertising industry and this complaint sometimes refer to the user's open web page dimensions as the "viewport."  When web page content is larger than the size of the viewport, the content can be understood to enter and leave the viewport as a user scrolls through the webpage.  If part of the content on a web page includes ad spaces, these ad spaces also often enter and leave the view port.

17.     If the user never scrolls to particular parts of the web page content, however, much of the content of the page, including ad spaces, may never have actually become viewable to the online reader.  The reader may never scroll to a part of the article where the ad space (and ad) would have appeared.

18.     Verifying whether an online ad entered a part of a web browser window that was viewable to each of many varied web browser/screen combinations presented a technological challenge that had to be solved for online advertising to work.  No advertiser wants to pay for ads that are effectively invisible, and publishers want to be able to demonstrate that viewers can see the ads their advertisers are paying for.

19.     RMC solved these and other technical issues with innovative, patented technology. By understanding the relationship between the size of content and the size of ads placed alongside the content, RMC's technology can, among other things: (1) confirm that an ad is actually placed with the content regardless of whether it becomes viewable (and for how long); (2) confirm that an ad (or a percentage of an ad in a given ad space) actually was displayed in the viewport (and for how long); (4) allow for an ad space to be refreshed with a different ad based on various criteria, such as how long or how much (or both) of the ad space had been within the viewport (so-called

"ad refresh"); and (5) assist in loading ads just before a user is expected scroll to the content that contains the ad space (what is sometimes referred to as "lazy loading"); .

20.     As of 2025, RMC has received more than ten issued United States patents for inventions related to ad viewability, monitoring, confirmation, lazy loading, refreshed ads and other technological solutions to the placement of ads on web pages.

21.     This Complaint will describe the '482 Patent as one example of the kind of technological disclosures that the Patents-in-Suit teach and disclose.

22.     The claimed inventions make specific technological improvements to the functionality and usefulness of electronic networks used for advertising. For example, the '482 Patent explains:

> The present invention improves over prior advertising systems and methods in many ways. The present invention does not embed advertising HTML, files within a web page, providing considerable economies to advertisers in saved labor, time and cost in terms of both inserting advertisements into web page files, and later changing any of those advertisements. The present invention functions totally transparently to a network user and which neither inconveniences nor burdens the user. The present invention does not require a network user to download or install on the user's computer a separate application program specifically to receive advertising or perform any affirmative act other than normal browsing to receive such advertising.

23.     The details of the system and methods are in the claims, which must be read in light of the specification, including its figures. The 83 figures in the patent make clear that a non-abstract system was invented. For example, Figure 1 is a diagrammatical overview of the communication flow of the present invention. Figure 2 is a diagrammatical representation of system components and their interrelationship. Figure 3 is a diagrammatical overview of the relationship among system servers and website viewers. Figure 51 is a is a diagrammatical overview of the interplay and overlap of a viewer's screen display area, browser application, browser window and ad content display page.









**FIG. 51**

24.    The '482 Patent describes the invention in the context of Fig. 51:

As can be seen, the ad content display page is larger than the browser window, so not all of the ad content display page area is within the browser window dimensions and scrolling position shown on the viewer's display screen. In this embodiment the activation of billboard modules can be controlled so that only the billboard

module that is designated to activate when a pre-defined area within the ad content display page area is within, or within a pre-defined distance outside of, the viewer's browser window dimensions and scrolling position is activated, and so that billboard module activation occurs only when such pre-defined ad content display page triggering area is within, or within a pre-defined distance outside of, the viewer's browser window dimensions and scrolling position.

25.     With reference to Figure 51, the area marked "41" is visible to the viewer or what was earlier described as the viewport.

26.     Electronic advertising that was never actually displayed or seen by consumers was an unresolved technical problem as of the time of the patented invention.

27.     The ability to place an ad in response to a determination that a particular ad space had been within the viewport of a user for a predetermined amount of time was an unresolved technical problem as of the time of the patented invention.

28.     The ability to place an ad in response to a determination that a particular ad space was outside of but nearing the viewport of a user was an unresolved technical problem as of the time of the patented invention.

29.     The '482 patent's claims address the problems with Internet advertising at the time. The RMC claims disclose an inventive solution for particular Internet-centric problems.

30.     The claims address these technical challenges. These challenges are particular to advertising on the internet and other electronic networks.  The claims do not resolve these problems by reciting an abstract idea or through routine, well-understood, or conventional steps or components. At the time of the invention, the individual elements in the claim, and the claimed combination, were not well-understood, routine, or conventional activity.

31.     The claims do not recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically

arising in the realm of computer networks.  Confirming that it is rooted in technology, and that it does not recite only conventional computer technology, the patent specification discloses over ten pages of sample computer code.

32.    The claims do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). The claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result different from the conventional and a result that overrides the routine and conventional sequence of events ordinarily triggered. The invention stops the computer network from operating in its normal, expected manner by reciting an invention that is different from the routine or conventional use of the Internet.

33.    The claims of the '482 patent do not claim any basic tool of scientific and technological work or hinder the use of any idea in all scientific fields.

34.    Multiple patents and patent applications constituting or related to the Patents-in-Suit have overcome rejections under § 101 in multiple fora. For example, the Patent Trial and Appeal Board reversed a rejection under § 101 of Application No. 11/803,779, now U.S. Patent No. 10,380,602. That decision is *Ex Parte Krassner*, dated December 18, 2018, and is attached as Exhibit A and incorporated by reference. The PTAB found those claims, similarly directed to presenting electronic advertisements on webpages, to be patentable subject matter.

35.    In its decision, the PTAB relied on *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) and held:

> Accordingly, as in *DDR Holdings*, the claims recite "a solution to this network-centric challenge," e.g., the efficient, timely, and cost effective application of advertisements to webpages, for which there was no precomputer or pre-Internet analog.

36.    During prosecution of another patent related to the '482 patent, U.S. Application

No. 11/643,245, now Patent No. 10,380,597, the examiner relied on the *Ex Parte Krassner* decision in the Notice of Allowance, explaining that "per the reasoning explained in the Patent Board Decision issued on December 18, 2018, the previous 101 rejection, 103 rejection, and examiner arguments have been withdrawn and the claims are allowable." A copy of the office action is attached as Exhibit B and incorporated by reference.

37.    With regard to one of the Patents-in-Suit, the '090 Patent, the Examiner made an initial 101 rejection, which was later discussed in an Interview. The Notice of Allowance states under the headings "Allowable Subject Matter" that the pending claims "are allowed."

38.    With regard to another of the Patents-in-Suit, the '453 Patent, the Examiner withdrew an initial 101 rejection in the Notice of Allowance, finding: "The Amendment in combination with other limitations form an ordered combination and integrated practical application. 101 withdrawn."

39.    With regard to another of the Patents-in-Suit, the '482 Patent, the Examiner withdrew an initial 101 rejection in the Notice of Allowance, finding: "Applicant argument resolved the 101 issues."

40.    With regard to another of the Patents-in-Suit, the '051 Patent, the Examiner withdrew an initial 101 rejection in the Notice of Allowance, finding:

> Examiner is removing the rejection under 35 USC 101. The currently amended independent claims include significantly more than any alleged abstract idea. The currently amended independent claims constitute an "ordered combination" that provide a specific, discrete implementation that provides significantly more than the abstract idea itself. To illustrate, the currently amended independent claims recite an ordered combination of features that are comparable to *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 2016 WL 3514158, (Fed. Cir. June 27, 2016). In BASCOM, the Federal Circuit held that "an inventive concept can be found in the ordered combination of claim limitations that transform the abstract idea into a particular, practical application of that abstract idea." *Id.* In particular, the currently amended independent claims are directed towards a specific, discrete implementation of browser advertising.

A copy of the Office Action is attached as Exhibit C and incorporated by reference.

41.     Technological solutions claimed in the Patents-in-Suit were not routine, well-understood, or conventional at the time of invention. In 2009, for example, David Cohen,  now the Chief Executive Officer of the Interactive Advertising Bureau, described RMC's technology: "It would appear that (among other things) RealVu has developed a technology that allows them to identify when an online ad is 'within the viewable area' of a user's screen, and for what duration." According to Mr. Cohen writing contemporaneously in 2009, the technology was "a giant step forward for the industry" that "will set a new bar for accountability – one that will influence all communications channels" and "could change everything." A copy of Mr. Cohen's blog post is attached as Exhibit D and incorporated by reference.

42.     In addition to findings in the PTAB, the Patent Office, and the contemporaneous reaction of industry insiders, the Court in *Rich Media Club, LLC v. Duration Media LLC*, 681 F.Supp.3d 1032 (D. Az. 2023) (the "Arizona '329 Action") determined that the claims of another patent related to the Patents-in-Suit, United States Patent No. 11,443,329 ("the '329 Patent"), was subject matter eligible. A copy of the court's decision denying a motion to dismiss asserting the '329 Patent was not subject matter eligible is attached as Exhibit E and incorporated by reference.

43.     The Arizona Court expressly found:

"the '329 Patent is directed to a non-abstract concept: a technological solution to a technological problem. There is no direct pre-computer analog to the problem of lack of accountability for consumer viewability of Internet advertisements caused by the consumer's ability to access the Internet using variations of computer devices with differently sized browser windows. The code generation claim limitation narrows with sufficient specificity the allegedly abstract concept of advertising in a predefined area upon determination of a predefined condition and does so in response to a problem that is unique to the Internet. Therefore, the claimed process of the '329 Patent is deeply rooted in technology and thus directed to a patent-eligible concept.

*Rich Media Club*, 681 F.Supp.3d at 1041.

44.    The Arizona Court also found:

The '329 Patent contains an inventive concept: implementing a sizing technology in a process for using generic computer equipment in a novel way. As the Examiner stated regarding the '329 Patent Application,3 the claims of the '329 Patent "in combination with other limitations form an ordered combination and integrated practical application" and thus overcome any objections to the validity of the '329 Patent under 35 U.S.C. § 101. (Am. Compl. Ex. D at 2.) The claims of the '329 Patent provide with sufficient specificity the process and method for Internet advertisement placement based on utilization of an inventive technology for determining the size of a user's browser window.

*Rich Media Club*, 681 F.Supp.3d at 1042.

45.    The Arizona Court's analysis was correct, and the analysis and conclusions apply with equal force to each of the Patents-in-Suit.

46.    Each of the Patents-in-Suit is patent subject matter eligible.

47.    None of the claims of the Patents-in-Suit are directed to an abstract idea (*Alice* Step One).

48.    Each of the claims of the Patents-in-Suit include an inventive step (*Alice* Step Two).

**A Previous Effort to Challenge the Validity of a Patent-in-Suit Failed**

49.    On May 17, 2024, Duration Media LLC filed a Petition for Inter Partes Review of the '482 Patent, which was identified as IPR2024-00937 ("the '937 Petition") by the PTAB.

50.    On October 17, 20224, the PTAB issued a institution decision denying institution of the '937 Petition. A copy of the decision denying institution is attached as Exhibit F and incorporated by reference.

51.    The PTAB's decision denying institution concluded that the references Duration submitted did not disclose at least this novel aspect of the '482 Patent: "in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window, causing a communication to be sent from the remote computing device to one or more dispatcher servers, wherein the one or more dispatcher servers

are configured to:(i) receive the communication, and (ii) cause advertisement content to be served to the remote computing device."  Ex. F at 13.

<u>**Select Objective Indicia of Non-Obviousness**</u>

52.    RMC has collected and presented extensive evidence of the presence of objective indicia of non-obviousness of the inventions described and claimed in the Patents-in-Suit.  Should Gannett challenge any of the Patent-in-Suit based on obviousness under section 103 of the Patent Law, any such challenge must consider this extensive objective indicia of non-obviousness under the "totality of the evidence" test set forth in *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 81 F.4th 1202 (Fed. Cir. 2023). For brevity, the exhibits supporting the objective indicia of non-obviousness are not filed with this complaint but will be produced with RMC's initial disclosures. In the meantime, the relevant exhibits are publicly available from the RMC filings in at least IPR2023-00953.

53.    As a matter of historical fact, there is no evidence of an actual demonstration of an ad viewability test, or the placement of refreshed ad in response to the viewability determination, prior to the invention by Rich Media Club.  As documented by the contemporaneous November 2009 blog post by David Cohen, the reaction of internet advertising industry executive was not only one of surprise, but also of the profound impact the invention would have on the internet advertising industry.

54.    The RMC invention had precisely the impact Mr. Cohen foresaw.  Again as a matter of historical fact, the online advertising industry coalesced around the need to replace what used to be called "served impressions" of ads with a new standard called the "viewable impression" as the very measurement on which advertisers would be charged.  The evidence of this historical fact is overwhelming and includes the 2013 IAB Annual Report, advisories issued by the Media

Ratings Council (the "MRC"), and historical webpages from the Making Measurement Make Sense initiative.

55.     The evidence falls squarely within the key objective indicia.  For example, the industry documentation of the need to replace the "served impression" with the "viewable impression" is quintessential "long felt need."  Upon learning that a viewable impression was technically possible, the industry came together to adopt it as a standard.  The industry felt the need to change to a standard based on RMC's invention.  This factor is of significant weight that the invention was not obvious.

56.     To answer this long felt need, the MRC began a process of accrediting companies whose technologies could accurately determine viewable impressions (as opposed to served impressions).

57.     As a matter of historical fact, the first company accredited by the MRC as being able to accurately determine viewable impressions (as opposed to served impressions) was RealVu LLC, a sister company of RMC that RMC set up to commercialize its inventions.

58.     The same documents demonstrate failure by others.  Against the backdrop of an industry pressing for a viewable impression standard – and engaging the MRC to oversee its adoption – the MRC had to issue an advisory against adopting the standard because of failure by others.

59.     For example, two years after it accredited RealVu's solution, the MRC ran a test with five different vendors reviewing 3 billion ad impressions, and found viewability test results that varied from 0% to 77%.  The MRC's independent, documented failure by others weighs significantly in favor of finding that this aspect of the invention was not obvious.

60.     Industry recognition of RMC/RealVu's contribution includes other examples of

commercial praise, including George Ivie's recognition that "RealVu essentially invented viewability" and the MRC's stating the following when RealVu's accreditation was renewed: "RealVu was the first company to apply for and gain MRC accreditation for a viewability solution, and in so doing, it helped to revolutionize the direction of digital advertising. Its latest accreditation achievements demonstrate RealVu's continued commitment to industry leadership.

61.    The IAB used similar language in its 2013 Annual Report, indicating that the change to a viewable impression standard was "revolutionary."

62.    The industry credits RMC/RealVu with inventing a viable viewability test that led to a revolution in the way ads were accounted for.  This commercial praise and industry recognition is yet another factor that should be given significant weight to find the invention non-obvious.

63.    The claims at issue in this case use the viewability test as a necessary predicate to refreshing a viewable ad space with a new ad.

64.    There is also extensive evidence of commercial success, licensing, and copying.

65.    RealVu's content rendering and control product embodies the claimed invention and are coextensive with it. Since the time the solution was introduced, RealVu has generated more than $30 million from its content rendering and control service.

66.    RealVu's commercial success, while relevant as an objective indicia of non-obviousness, is small compared to the overall commercial success of the invention.

67.    One aspect of the RMC inventions can be described as "ad refresh."  This is the process of replacing an ad in an ad space in response to a determination that the ad space is within the viewport of a user's device and the ad space has been visible for a sufficient period of time that a new ad can refresh the space.  Internet users encounter this process all the time.  They have a webpage open and an old ad is refreshed with a new one.

68.     What many internet users experiencing an ad refresh may not realize is that, behind the scenes, a flurry of activity occurs. First, the system determines that an ad space (or a significant enough portion of one) has been in the user's viewport for a long enough time that an ad refresh is appropriate. Next, in response to that determination, the system sends a communication to ad servers to refresh the ad.  In some instances, the ad server serves another ad.  In other, the ad server conducts a real-time auction to determine which new ad should refresh the old one. This is sometimes referred to as "real-time bidding" or RTB.

69.     The specific process described in the preceding paragraph is rooted in technology, was invented by RMC, and is lies at the heart of the "ad refresh" business of the Internet.

70.     By one rough estimate, the "ad refresh" aspect of the invention may be responsible for generating $24-42 billion or more per year in internet advertising. This estimate was made using a generative AI system (Anthropic's Claude Sonnet 4.0 model) that sites several reliable sources in making the estimate.  A copy of the output, including the sources it relies upon (all of which have been verified as linking to actual websites that contain the cited information) is attached as Exhibit G.

71.     The estimate starts with two data points provided by Statista and eMarketer: that so-called "programmatic digital display advertising" accounts for roughly 91% of all digital display advertising, a market that totals approximately $157-168 billion in 2024.

72.     According to two other sources (Pubstack and Relevant-digital), publishers implementing ad refresh strategies see revenue uplifts ranging from 5-10% to 30-40%.

73.     Using an estimate in the middle of those ranges, 15-25%, results in estimated revenue of $24-42 billion annually in the US from ad refresh/rotation.

74.     Discovery will confirm whether, and to what extent, ad refresh technologies are

used by Gannett and the amount of incremental revenue they have generated.

75.     In addition to ad refresh solutions developed by RealVu and those that are used at publishers like Gannett, at least one other company was established with the sole purpose of placing ads in response to a determination that the ads would only be placed after a determination that the ad space was in the viewport of a user's computer.  That company, Duration Media, initially did not have its own technology and instead licensed the technology from RMC.  This licensing is another objective indicia of non-obviousness.

76.     Duration Media's commercial success using technology licensed from RMC is another objective indicia of non-obviousness.

77.     After initially licensing RealVu's solution, Duration copied the functionality of the services it had previously purchase from RealVu.  Such copying is another objective indicia of non-obviousness.

78.     To date, RMC has entered license agreements regarding use of its patented technology with several companies.  These licenses are additional objective indicia of non-obviousness.

**<u>Gannett and the Accused Activity</u>**

79.     One way Gannett distribute content is through the websites it owns and operates at www.usatoday.com and other websites.

80.     The Patents-in-Suit cover three different ways Gannett displays ads on at least www.usatoday.com and other websites.

81.      The '074 Patent and the '453 Patent include claims where websites determine whether an ad space is outside of, but nearing, the viewport, in which case ads are inserted into the ad space as it nears the viewport.  A common industry term for this process is "lazy loading," and

Gannett websites that incorporate this feature are the Accused Lazy Loading Websites (including at usatoday.com).

82.    One of the Patents-in-Suit, the '482 Patent, includes claims where the websites determine whether a sufficient percentage of an ad space is in the viewport and, if so, to initiate an ad refresh of the ad space. Gannett websites that incorporate this feature (including at least usatoday.com) are the Accused Ad Refresh Websites.

83.    Two of the Patents-in-Suit, the '090 Patent and the '453 Patent, include claims that require use of both the lazy loading feature and the ad refresh feature. Gannett websites the incorporate both features (including at least usatoday.com) are the Accused Lazy Loading and Ad Refresh Websites.

84.    On June 19, 2023, RMC sent a notice of patent infringement letter to Gannett regarding its infringement of U.S. Patent Nos. 11,443,329, 11,468,453, and 11,741,482 (then pending as patent application number 17/961,952). The letter included detailed claim charts for each infringed claim.

85.    Gannett acknowledged receipt of the materials by at least July 6, 2023, when they were resent at the request of counsel.  Licensing negotiations continued until approximately January 2025, when the law firm Rothwell Figg announced it was representing Gannett.

86.    The Rothwell Figg firm represents approximately 10 different publishers put on notice of infringement by RMC.  None of these publishers have engaged in license negotiations since retaining Rothwell Figg, and Rothwell Figg has made it clear that it will not engage in licensing negotiations on behalf of any of the clients it represents (including Gannett) regarding the RMC patents.

87.    Consistent with the position of Rothwell Figg, licensing negotiations did not progress with Gannett following the retention of Rothwell Figg.

88.    To date, Gannett has not entered into a license agreement with RMC

### Count I: Infringement of U.S. Patent No. 9,824,074

89.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

90.    Gannett directly infringes at least claim 16 of the '074 Patent by practicing the method set forth in the claim on each of the Accused Lazy Loading Websites:

| Claim 16 | The Accused Lazy Loading Websites |
|---|---|
| 16. A method comprising: | Not necessarily a claim limitation, but the Accused Lazy Loading Websites practice the claimed method. |
| [16(a)] determining, by code executed by a computing system, whether a pre-defined area on a content page in which content is to be rendered is at least partially within a visible area of an application window on a display device by comparing coordinates of the pre-defined area with coordinates of the application window, the pre-defined area comprising a placeholder location on the content page in which content is to be rendered; | The Accused Lazy Loading Websites, determine whether at least a portion of a pre-defined area (for example, a placeholder for an ad display area) of a content page is within the viewport by comparing the coordinates of the pre-defined area with coordinates of the web browser window. |
| [16(b)] determining, by the code executed by the computing system, whether the pre-defined area on the content page in which content is to be rendered is completely outside of the visible area of the application window and is also within a distance outside of the visible area of the application window by comparing the coordinates of the pre-defined area with the coordinates of the application window; | The Accused Lazy Loading Websites also determine whether the pre-defined area (for example, a placeholder for an ad display area) of a content page is completely outside the viewport but also sufficiently close to the viewport by comparing the coordinates of the pre-defined area with coordinates of the web browser window. |
| [16(c)] transmitting, by the code executed by the computing system, one or more | The Accused Lazy Loading Websites, after determining that the pre-defined area(s) are at |

| Claim 16 | The Accused Lazy Loading Websites |
|---|---|
| indications selected from the group consisting of:<br><br>an indication that the pre-defined area is at least partially within the visible area of the application window;<br><br>an indication that the pre-defined area is outside the visible area of the application window; and<br>an indication that the pre-defined area is within the distance outside of the visible area of the application window; | least partially within the viewport or outside but close to the viewport, transmit code identifying those predefined area(s) the Accused Lazy Loading Websites have so determined. |
| [16(d)] in response to determining that the pre-defined area on the content page in which content is to be rendered is at least partially within the visible area of the browser window, provide instructions to:<br><br>retrieve one or more content files; and<br><br>render the one or more content files in the pre-defined area on the content page in which content is to be rendered; and | The servers running the Accused Lazy Loading Websites, based on determining that the pre-defined area is at least partially within the viewport but is also close to it, provide instructions to retrieve and render content (an ad, for example) |
| [16(e)] in response to determining that the pre-defined area on the content page in which content is to be rendered is completely outside of the visible area of the browser window and is also within the pre-defined distance outside of the visible area of the browser window, provide instructions to:<br><br>retrieve the one or more content files; and<br><br>render the one or more content files in the pre-defined area on the content page in which content is to be rendered. | The servers running the Accused Lazy Loading Websites, based on determining that the pre-defined area is completely outside the viewport but is also close to it, provide instructions to retrieve and render content (an ad, for example) |

91.    RMC is only asserting infringement of the method claims of the '074 Patent, resulting in Gannett being liable for infringement of the '074 for the period starting six years prior

to the filing of this Complaint until the '074 expires or Gannett's infringement stops.

92.    RMC has suffered and is suffering damages as a result of Gannett's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

### Count II: Infringement of U.S. Patent No. 11,004,090

93.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

94.    Gannett directly infringes at least claim 23 of the '090 Patent by practicing the method set forth in the claim on each of the Accused Lazy Loading and Ad Refresh Websites:

| Claim 23 | The Accused Lazy Loading and Ad Refresh Websites |
|---|---|
| 23. A method comprising: | Not necessarily a claim limitation, but the Accused Lazy Loading and Ad Refresh Websites practice the claimed method. |
| [23(a)] designating, by one or more computing systems, a first predetermined area on an ad content page; | The Accused Lazy Loading and Ad Refresh Websites determine a first predetermined area of an ad content page, e.g., the "placeholder" area for the display of advertisements. |
| [23(b)] providing that, in response to a request, the ad content page with a designation of the predefined area and associated instructions in the form of code are served to a remote computing device operating a browser and displaying a browser window; | The Accused Lazy Loading and Ad Refresh Websites operate by responding to requests (typically in the form of a url for a website) by sending the requested webpage to the remote computing device (i.e., the user's computer) that is operating a web browser and displaying a browser window. |
| [23(c)] providing that the remote computing device determines whether the predefined area is within a predefined distance outside a visible area of the browser window and that in at least partial response to such determination a first ad content is served to the remote computing device and rendered in the first predetermined area; and | The code running on the Accused Lazy Loading and Ad Refresh Websites on the user's computer determines that the predefined area is outside the viewport but is also close to it. In response to that determination, the Accused Websites serve an ad to the user's computer which is rendered in the ad placeholder area (i.e., "lazy loading"). |
| [23(d)] wherein the instructions are | In addition to lazy loading ads, the Accused |

| Claim 23 | The Accused Lazy Loading and Ad Refresh Websites |
|---|---|
| configured, in conjunction with the browser to direct the computing device to:<br><br>periodically determine whether the first predetermined area is in view within the visible area of the browser window on the remote computing device; and<br><br>in response to determining that the first predetermined area has been in view within the visible area of the browser window for a predefined time, send a communication to one or more server computing systems; | Lazy Loading and Ad Refresh Websites also monitor how long the ad placeholder has been within the viewport and once a threshold period of time has passed, the Accused Lazy Loading and Ad Refresh Websites send a request to a server operating the Accused Lazy Loading and Ad Refresh Websites (i.e., a request for a "second print" ad) |
| [23(e)] providing that the one or more server computing systems are configured to:<br><br>receive the communication from the computing device; and<br><br>in response to receiving the communication from the remote computing device, select a replacement advertisement to display on the page;<br><br>serve the replacement advertisement to the remote computing device; and<br><br>the method further providing that the instructions in conjunction with the browser cause that the replacement advertisement is rendered in the first predetermined area. | The servers running the Accused Lazy Loading and Ad Refresh Websites receive the communication that an ad area is ready for an ad refresh, after which a replacement ad is served to the user's computer, where it is rendered in the ad placeholder area. |

95.    RMC is only asserting infringement of the method claims of the '090 Patent, resulting in Gannett being liable for infringement of the '090 for the period starting when the '090 Patent issued (May 4, 2021) until it expires or Gannett's infringement stops.

96.    RMC has suffered and is suffering damages as a result of Gannett's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be

determined at trial.

### Count III: Infringement of U.S. Patent No. 11,468,453

97.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

98.    Gannett directly infringes at least claim 5 of the '453 Patent by practicing the method set forth in the claim on each of the Accused Lazy Loading and Ad Refresh Websites. Detailed claim charts explaining the basis for infringement for one of the Accused Lazy Loading and Ad Refresh Websites was sent to Gannett with the notice of infringement letter sent on April 28, 2023.  The chart is attached as Exhibit H and are hereby incorporated by reference.

99.    RMC is only asserting infringement of the method claims of the '453 Patent, resulting in Gannett being liable for infringement of the '453 Patent for the period from when the '453 Patent issued (October 11, 2022) until it expires or Gannett's infringement stops.

100.    RMC repeatedly reached out to Gannett to follow up regarding the infringement notice.

101.    At no time did Gannett make a proposal to license the '453 Patent from RMC.

102.    RMC has suffered and is suffering damages as a result of Gannett's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

103.    Gannett's deliberate and willful refusal to participate in voluntary licensing negotiations means that the only method by which RMC can be compensated for Gannett's practicing methods covered by the '453 Patent is via litigation to enforce RMC's patent rights.

104.    Gannett's infringement of the '453 Patent, particularly in light of its refusal to engage in licensing negotiations, is therefore willful and deliberate, entitling RMC to increased

damages under 35 U.S.C. § 284.

105.    Gannett's conduct is also exceptional, entitling RMC to recover its attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## Count IV: Infringement of U.S. Patent No. 11,741,482

106.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

107.    Gannett directly infringes at least claim 1 of the '482 Patent by practicing the method set forth in the claim on each of the Accused Ad Refresh Websites.  A detailed claim chart explaining the basis for infringement for the Accused Ad Refresh Websites was sent to Gannett with the notice of infringement letter sent on April 28, 2023.  An updated chart reflecting the issuance of the patent is attached as Exhibit I and is hereby incorporated by reference.

108.    Gannett is liable for infringement of the '482 Patent for the period June 7, 2023 (before it issued based on pre-suit notice) until it expires or Gannett's infringement stops.

109.    RMC repeatedly reached out to Gannett to follow up regarding the infringement notice.

110.    At no time did Gannett make a proposal to license the '482 Patent from RMC.

111.    RMC has suffered and is suffering damages as a result of Gannett's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

112.    Gannett's deliberate and willful refusal to participate in voluntary licensing negotiations means that the only method by which RMC can be compensated for Gannett's practicing methods covered by the '482 Patent is via litigation to enforce RMC's patent rights.

113.    Gannett's infringement of the '482 Patent, particularly in light of its refusal to engage in licensing negotiations, is therefore willful and deliberate, entitling RMC to increased damages under 35 U.S.C. § 284.

114.    Gannett's conduct is also exceptional, entitling RMC to recover its attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## Count V: Infringement of U.S. Patent No. 12,125,051

115.    RMC reasserts and realleges the previous paragraphs of this Complaint as though set forth fully here.

116.    Gannett directly infringes at least claim 1 of the '051 Patent by making, using, and selling Accused Ad Refresh Websites that incorporate the claimed computer program:

| Claim 1 | The Accused Ad Refresh Websites |
|---|---|
| 1. [preamble] A computer program product for rendering advertisement content in an ad content display page, | Not necessarily a claim limitation, but Gannett makes Accused Ad Refresh Websites include the claimed computer program for rendering ads on webpages. |
| [preamble.1] wherein the ad content display page includes (i) a predefined area configured to display advertisement content, the predefined area being a portion of the ad content display page, and (ii) page content displayed in other portions of the ad content display page, the page content being separate from the advertisement content, the ad content display page being scrollable to allow a portion of the ad content display page to appear in a visible area of a browser window of a browser that is configured to be operated by a remote computing device, | Not necessarily a claim limitation, but the Accused Ad Refresh Websites comprise ad content display pages (webpages) that include predefined areas (ad placeholder areas) that are subparts of the webpages that also include other content that is separate from the ad content.  The webpages can be scrolled such that a portion of the page appears in a visible area (the viewport) of a browser window on a user's computer. |
| [preamble.2] the computer program product comprising a non-transitory computer readable medium tangibly embodying computer-executable program instructions thereon that, when executed, cause one or more computing devices to: | Not necessarily a claim limitation, but the Accused Ad Refresh Websites operate through stored computer instructions |

| Claim 1 | The Accused Ad Refresh Websites |
|---|---|
|  |  |
| (a) determine whether a predefined portion of the predefined area of the ad content display page is in the visible area of the browser window; and | The Accused Ad Refresh Websites determine whether a predefined portion of the ad placeholder areas are in the viewport. |
| (b) in response to a determination that the predefined portion of the predefined area of the ad content display page is in the visible area of the browser window, cause a communication to be sent from the remote computing device to one or more dispatcher servers,<br><br>wherein the one or more dispatcher servers include computer-executable program instructions thereon that, when executed:<br>(i) receive the communication, and<br>(ii) cause advertisement content to be served to the remote computing device, | In response to the above determine, the Accused Ad Refresh Websites send a communication to one or more dispatcher servers. |
| (b)[.1] wherein the one or more dispatcher servers include computer-executable program instructions thereon that, when executed:<br><br>  (i) receive the communication, and<br><br>  (ii) cause advertisement content to be served to the remote computing device, | The servers receive the communication and cause ads to be served to the user's computer. |
| [c] wherein the browser is configured to render the advertisement content in the predefined area of the ad content display page, and | The Accused Ad Refresh Websites render the ads in the ad placeholder areas. |
| [d] wherein the advertisement content first appears in the predefined area of the ad content display page only after the one or more dispatcher servers serve the advertisement content to the remote computing device and the browser renders the advertisement content in the predefined area of the ad content display page. | The ad selected in the process above only appears after it has been served by the servers. |

117.    Gannett being liable for infringement of the '051 Patent from the date of the service of the Complaint until the '051 Patent expires or Gannett's infringement stops.

118.    RMC has suffered and is suffering damages as a result of Gannett's infringement, which damages may include lost profits or, at a minimum, a reasonable royalty in an amount to be determined at trial.

## Jury Demand

RMC demands a trial by jury on all issues that may be so tried.

## Request For Relief

WHEREFORE, Plaintiff RMC requests that this Court enter judgment in its favor and against Defendant Gannett as follows:

A.    Adjudging, finding, and declaring that Gannett has infringed the Patents-in -Suit, under 35 U.S.C. § 271;

B.    Awarding past damages arising out of Gannett's infringement of the Patents-in-Suit to RMC either in the amount of RMC's lost profits or in an amount no less than a reasonable royalty, together with prejudgment and post-judgment interest, in an amount according to proof;

C.    Adjudging, finding, and declaring that Gannett's infringement is willful and awarding enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

D.    Awarding attorneys' fees, costs, or other damages pursuant to 35 U.S.C. §§ 284 or 285 or as otherwise permitted by law;

E.    Entering an injunction preventing Gannett from continuing to infringe the Patents-in-Suit;

F.    Granting RMC such other further relief as is just and proper, or as the Court deems appropriate.

Dated: September 4, 2025                    Respectfully submitted,


                                           /s/ *David Berten*
                                           David Berten
                                           IL Bar # 6200898 (also admitted in ED Texas)
                                           dberten@giplg.com
                                           Alison Aubry Richards
                                           IL Bar # 6285669 (also admitted in ED Texas)
                                           arichards@giplg.com
                                           Michael Healy
                                           IL Bar # 6345633 (also admitted in ED Texas)
                                           mhealy@giplg.com
                                           Global IP Law Group, LLC
                                           55 West Monroe Street, Suite 3400
                                           Chicago, IL 60603
                                           Telephone: (312) 241-1500

                                           *Attorneys for Plaintiff Rich Media Club, LLC*